Filed 2/28/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>TYRIS LAMAR FRANKLIN,<br><br>　　　Defendant and Appellant. | A135607<br><br>(Contra Costa County<br>Super. Ct. No. 05-110301-9) |

　　　Defendant Tyris Lamar Franklin appeals a judgment convicting him of one count of first degree murder and sentencing him to a mandatory term of 50 years to life in prison. He contends the court made numerous instructional and evidentiary errors and that because he was 16 years of age at the time of the crime his sentence violates the Eighth Amendment prohibition against cruel and unusual punishment as interpreted by *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). We find no error with respect to the merits of his conviction and conclude that any potential constitutional infirmity in his sentence has been cured by the subsequently enacted Penal Code section 3051, which affords youth offenders a parole hearing sooner than had they been an adult. Accordingly, we shall affirm the judgment.

**Factual and Procedural History**

　　　On March 9, 2011, defendant was charged under Penal Code section 187 with the murder of 16-year-old Gene G. The information also alleged a personal firearm discharge

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1, 2, 3, 4, 5, and 7 of the Discussion.

enhancement (Pen. Code, § 12022.53, subds. (b)-(d)). The following evidence was presented at trial:

On January 10, 2011, defendant was with four friends when he received a phone call from his older brother. According to defendant, his brother told him that their 13-year-old younger brother had been "jumped" by a boy named Kian and his friends, all of whom were from Crescent Park.[1] After the attack, Kian apparently told defendant's younger brother they were looking for defendant. Defendant told his friends that his brother had been "jumped" by Kian and others from Crescent Park and he asked one of his friends for a ride to the area. He did not mention Gene as one of the attackers when telling the story to his friends.

When asked what he was going to do at Crescent Park, defendant said something like, "I don't even know. I'm just going to go over there and get on something." Defendant's friends understood that to mean he was going to get in a fight. Defendant testified that after receiving the phone call, he was angry and afraid for his family. He wanted to go to Crescent Park because he did not know what the boys from Crescent Park were going to do next and he wanted to see what they wanted. He claimed he did not have a plan to shoot anyone but admitted that he knew there was a "possibility that [he] might."

The ride to Crescent Park took about five minutes. Two of the juveniles in the car with defendant (Khalifa and Jaswinder) testified for the prosecution. One described defendant's demeanor during the ride as "chill" or relaxed, but the other testified that he seemed angry. When the group arrived at Crescent Park, they saw Gene walking down the street. Gene was known to be friends with Kian, the person who had assaulted defendant's brother. When defendant asked the driver to unlock the door, Khalifa asked, "Why we riding up on Gene when he don't have anything to do with the situation?"

---

[1] Richmond police officers testified that Crescent Park refers to a multi-unit high rise housing complex in the southern part of Richmond. Both defendant and Gene resided in Crescent Park, but defendant testified that he was not part of what he described as the "Crescent Park gang."

Defendant responded with something like, "It don't matter. He is from the Crescents." or "It doesn't matter. They beat up my brother." Jaswinder confirmed that defendant said something like, "It doesn't matter. He's still from Crescent Park."

As defendant got out of the car, he pulled a silver gun from his waistband. According to a witness who observed the events from a balcony across the street, defendant walked around the parked car towards the victim and, without saying anything, shot him several times. She testified that defendant began shooting "shortly after he got out of the car" and before he reached the victim. Jaswinder and Khalifa confirmed that they did not hear any conversation between defendant and the victim before the shots were fired. After the shooting, defendant returned to the car and the car sped off. Back in the car defendant said something like, "That Crescent Park dude is a sucker."

Defendant testified that as he approached Gene he asked, "Which one of you motherfuckers just jumped my little brother?" Gene assertedly replied, "Fuck you and fuck your little brother." At that point, he took the gun from his waistband and shot at the victim. He explained that when he heard Gene's response, he was angry and upset with both Gene and the Crescent Park gang. He was in shock. He "felt . . . numb. It was like — it was so much. It was, it was like everything just — I don't know, just — it just, I don't know. Like, I — I wasn't in my body no more. It was like I don't remember everything like."

At approximately 3:36 p.m., Richmond police responded to the shooting. They arrived to find the 16-year-old victim on the floor of his apartment, having suffered multiple gunshot wounds to his head and body. Gene was pronounced dead at the scene.

The victim's aunt testified that when she heard the gun shots she looked out the window of the apartment where she and Gene lived and saw a young man with a handgun shooting downwards multiple times. A few minutes later, the front door of the apartment opened and the victim ran in, holding his right shoulder exclaiming, "I've been hit" before collapsing on the floor. At trial, the aunt identified defendant as the shooter.

Officers confirmed that earlier that day they had received a report that defendant's 13-year-old brother had been assaulted. He had identified his attacker as Kian and told the police that Kian told him to tell his brother, defendant, that Kian was looking for him.

On cross-examination, both Khalifa and Jaswinder testified that they had seen defendant engage in fights before, but that he had previously used only his fists and not a weapon. Khalifa testified that defendant and Kian "had problems" with each other and had been involved in prior fights and disagreements. Jaswinder was unable to identify who, other than defendant, had been involved in any of the prior fights he had witnessed.

In his direct testimony, defendant testified about his history with the victim and the Crescent Park gang prior to the shooting. Defendant had been friends with the victim from fifth until seventh grade, but they were no longer friends at the time of the shooting. Defendant had no further contact with the victim until the day of the shooting. He did continue to have problems with others from Crescent Park. He had recently been in a number of fights with others. Defendant acknowledged that sometimes he started the fights but claimed that sometimes the others had started them. Defendant testified about a fight that had occurred recently at a local BART station between him and "Lisso," another member of the Crescent Park gang. Defendant also believed that the gang had shot at his house several times in the recent past. Finally, defendant testified that days before the shooting Kian and another boy from Crescent Park came to defendant's classroom, where Kian pulled up his shirt, displaying a gun on his hip. Defendant understood this demonstration to be a threat. On the morning that Gene was shot, defendant spoke to his older brother about what had happened with Kian in the classroom, and his brother gave him a gun for protection.

Defendant admitted he knew that Gene had nothing to do with the beating of his younger brother. When he got out of the car, he was not specifically angry at Gene, but was generally angry at Lisso and Kian and "other people that's in their gang." He acknowledged that he had no reason to believe that Gene was responsible for the shots fired at his family's home, other than that Gene was associated with the Crescent Park gang.

4

On cross-examination, the prosecutor questioned defendant extensively about his history of fighting. Questions were asked both about fights involving boys from Crescent Park and others. The prosecutor accused defendant of lying about the nature of the fight with Lisso at the BART station. When confronted with a police report that described the incident as defendant and three others assaulting Lisso, rather than a one-on-one fight as defendant claimed, defendant accused the officer of lying.

On rebuttal, the prosecutor called BART Police Officer Enerio to testify regarding the fight he observed between defendant and Lisso. Enerio testified that on July 6, 2010, at approximately 3:35 p.m. he was on patrol at the El Cerrito Del Norte BART station and observed a fight occurring in the bus zone, on the west side of the station. He saw four individuals beating on an individual on the ground. Defendant was picking up the individual and slamming him against the wall and the sidewalk and the others in the group were punching the individual in the face. As Officer Enerio approached, the four individuals ran in separate directions. Enerio decided to follow defendant who he believed to be the primary aggressor.

The defense then called Lisso who testified that he could not remember how many people attacked him and that the police arrived only after the fight was over.

The jury found defendant guilty of first degree murder and found the firearm personal use and discharge allegation to be true. Defendant was sentenced to 25 years to life for the murder and a consecutive 25-to-life term on the firearm enhancement, for a total sentence of 50 years to life in state prison.

Defendant filed a timely notice of appeal.

**Discussion**

1.  *The trial court did not err in refusing to instruct the jury on voluntary manslaughter.*

"In criminal cases . . . the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the

5

offense was less than that charged." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) Voluntary manslaughter based on a heat of passion is a "lesser necessarily included offense of intentional murder." (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154.)

Defendant argues that the trial court erred in refusing to instruct on heat of passion voluntary manslaughter because there was ample evidence that defendant committed voluntary manslaughter, rather than murder. We review the trial court's ruling de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Heat-of-passion manslaughter has both an objective and a subjective component. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327, overruled on a different point in *People v. Barton* (1995) 12 Cal.4th 186, 201.) To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while "under the influence of a strong passion at the time of the homicide." (*Wickersham*, *supra*, at p. 327.) To satisfy the objective or "reasonable person" element, the heat of passion must be due to "sufficient provocation." (*Id.* at p. 326.) "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation] or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

In this case, the trial court correctly concluded that there was not sufficient evidence of objective or reasonable provocation to warrant the voluntary manslaughter instruction. As the trial court explained, the victim's alleged statement "Fuck you and your brother" is simply not "so provocative that a person of average disposition would act rashly and without due deliberation from passion rather than from judgment." Assuming that there was substantial evidence that defendant and his family had been subjected to ongoing violence and harassment at the hands of the Crescent Park gang, no evidence was presented that would have led a reasonable person to believe the victim was involved

6

in the prior incidents at defendant's home or, more immediately, the attack on defendant's brother, much less that these events would have caused a reasonable person to have acted rashly hours or days later at the time of the shooting. Even defendant conceded that he did not believe at the time of the shooting that the victim had assaulted his brother. Prior to the attack defendant did not mention that Gene was involved and he testified at trial that he had no reason to believe he was involved. When Khalifa pointed out that Gene was not involved in the attack on his brother, defendant did not correct him and his response makes clear that it was merely his general association with the Crescent Park gang that made him a target. Because there was insufficient evidence of provocation, both subjectively and objectively, defendant was not entitled to a voluntary manslaughter instruction.

2. *The trial court did not err in excluding the testimony of defendant's family members.*

Defendant sought to introduce the following testimony by two of his family members: About 11 months prior to the killing, someone shot at the home of defendant's family. As the grandmother was walking out of the house, she saw a young man approach defendant's older brother and make threatening statements. The young man called the older brother names and then opened his coat to display a firearm. After seeing the victim's photograph in the paper, the grandmother thought that this young man could have been Gene. Family members would also testify about two other attacks, including one incident in which the windows of defendant's mother's car were shot out and the tires of the car slashed. Both witnesses would have testified that they thought the attack was by the Crescent Park gang because "[e]veryone talked about it being the same group of Crescent Park guys who was conducting this attack on the Franklin family's home."

The trial court excluded this evidence under Evidence Code section 352 on the ground that it was only marginally relevant to the issue of provocation and would be prejudicial, confusing, and require undue consumption of time by creating a need for a mini-trial regarding the circumstances of the prior incidents. This determination was well within the proper exercise of the trial court's discretion.

7

The excluded evidence was largely cumulative. Defendant testified extensively regarding the history of his and his family's disputes with the Crescent Park gang, including the prior incident during which someone shot at his home. The excluded testimony that family members also believed that the Crescent Park gang was responsible for these incidents would not establish that they were, in fact, responsible. Moreover, neither the prosecution nor any witness disputed defendant's description of the prior animosity that existed towards the Crescent Park gang, so there was little need for corroboration in this respect. The proffered testimony was of even less value to corroborate defendant's subjective state of mind at the time of the shooting. The highly speculative and belated identification of Gene as a possible participant in the prior incident at defendant's home adds nothing to defendant's state of mind at the relevant point of time. As the trial court noted, the grandmother's potential identification of the victim, well after the shooting was complete, was irrelevant.

Contrary to defendant's suggestion, the court did not fail to understand the asserted relevancy of this evidence to his provocation defense. As defendant notes, provocation can negate premeditated first degree murder and reduce it to second degree murder and yet not be sufficient to reduce murder to heat of passion manslaughter because the existence of provocation to negate deliberation and premeditation rests on a subjective evaluation of the defendant's actual state of mind and does not include an objective component. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) Defendant contends that "the excluded evidence would have been relevant to show that [his] intent to kill was a product of simmering provocation that culminated in the attack on his brother, rather than a product of deliberation and premeditation." Defendant's simmering anger at the Crescent Street gang, however, was hardly sufficient to negate the deliberation and premeditation established by the evidence, especially since defendant admitted that he did not believe the victim was involved in the prior incidents.

Even if the evidence should have been admitted, the error was clearly harmless. (*Chapman v. California* (1967) 386 U.S. 18.) The jury was instructed pursuant to CALCRIM No. 522 as follows: "Provocation may reduce a murder from first degree to

8

second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder." Counsel argued strenuously that the shooting was a product of a strong emotional reaction to the assault on defendant's brother and that defendant was acting rashly and impulsively rather than carefully and deliberately. The jury, however, did not agree. There is no reason to believe that the limited corroboration of the prior incidents, which the prosecution did not question, would have resulted in a different outcome.

3.    *The court did not err in admitting Officer Enerio's rebuttal testimony*.

Prior to defendant's testimony, the court ruled that if defendant testified, his conduct underlying his prior juvenile adjudications, including the incident at the BART station, would be admissible as acts of moral turpitude for the purpose of impeachment. When cross-examined about the BART incident, defendant claimed that it was a "one-on-one fight" between him and Lisso. He explained that Lisso and others had "jumped" him a week prior and when he saw Lisso alone at the BART station they fought. When questioned about the police report prepared following the BART fight, defendant claimed that Officer Enerio lied when he reported that any other boys were involved in the fight. Over objection, Officer Enerio subsequently was allowed to testify to his recollection of the incident.

The court offered the following explanation for the admission of Enerio's testimony: "He said he was the only one, that it was not him and three other guys. The police officer lied, which puts directly in issue what really happened. Was it him and three guys? And that bears on his credibility as well as the degree to which he's violent. And I think it's legit. [¶] He was asked, Didn't you and three other people jump [Lisso]? [¶] No we didn't. [¶] Did you beat him? [¶] I did personally. [¶] With three other people right? [¶] No, by myself. [¶] It puts directly in issue what happened here and the defendant's credibility as well. That's fair game."

Defendant contends the trial court abused its discretion in admitting this testimony. He argues that the testimony was irrelevant and "unfairly prejudicial and it

9

resulted in a mini-trial regarding the BART fight, in which the putative victim of the fight testified *for the defense*."

Under *People v. Wheeler* (1992) 4 Cal.4th 284, prior misconduct of a witness that involves moral turpitude is admissible to impeach his or her credibility, whether or not the conduct resulted in a criminal conviction. (*Id.* at pp. 291–292, 295 [witness may not be impeached with the fact of a prior juvenile adjudication because it is not a conviction but evidence of the underlying conduct is admissible, if the conduct involved moral turpitude.].) The determination whether conduct involves moral turpitude is a question of law subject to independent review on appeal. (*Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 74, fn. 7.) However, whether such evidence should be admitted for impeachment is subject to the trial court's discretion under Evidence Code section 352, and that ruling is reviewed for abuse of discretion. (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091-1092.) [2]

Defendant does not directly challenge the court's conclusion that the assault, as described by Enerio, was conduct evidencing moral turpitude. He argues instead that the court should have excluded the evidence under section 352 because "Officer Enerio's testimony had little or no relevance as impeachment with a prior act of moral turpitude" because his testimony "provides little evidence of an aggravated assault." We disagree with defendant's characterization of the assault described by Enerio as merely a "simple assault or battery." (See *People v. Ayala* (2000) 23 Cal.4th 225, 273 [" 'Whether the trial court admits evidence of past misconduct should be determined solely on the basis that

---

[2] Contrary to defendant's argument, Officer Enerio's testimony was not impeachment on a collateral matter. As a general rule, "[a] party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be thereafter contradicted. [Citations.] This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions." (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 461.) As discussed above, however, Enerio's testimony was neither inadmissible nor offered merely to prove that he had lied on cross-examination. Enerio's testimony was relevant and independently admissible as impeachment evidence tending to show moral turpitude. (See *People v. Price* (1991) 1 Cal.4th 324, 436.)

that conduct evinces moral turpitude. The label is not important [i.e., what type of statutorily defined offense, if any, the conduct constitutes]—the conduct is.' "].) The underlying conduct described by Enerio involved an assault in which defendant led three others in repeatedly striking a defenseless victim. While every assault does not necessarily reflect moral turpitude, the circumstances of this attack could reasonably be considered to do so. Moreover, defendant's leadership role in the incident can also be regarded as demonstrating "a 'readiness to do evil.' " (*People v. Wheeler, supra*, 4 Cal.4th 284, 289.)

Officer Enerio's testimony was not unduly time consuming. The testimony of Enerio and Lisso combined required less than 23 pages of transcript. Nor was the testimony unduly prejudicial. Considering the severity of the charged crime and defendant's own testimony regarding prior confrontations with the Crescent Park gang, there is no reason to believe, as defendant suggests, that the jury's passion was inflamed by Enerio's testimony and that the jury" decide[d] the case based on something other than evidence presented at trial." There was no abuse of discretion in the admission of this testimony.

4. *Counsel did not render ineffective assistance by failing to object to the prosecution's cross-examination of defendant regarding his prior unrelated fights*.

As noted above, prior to defendant's testimony, the court ruled that evidence regarding defendant's conduct underlying his prior juvenile adjudications would be admissible as impeachment if the conduct reflected moral turpitude. The prosecution argued that defendant's conduct in the incident that occurred when defendant was in eighth grade, for which defendant was adjudicated a ward and sent to a juvenile facility, involved moral turpitude because the allegation was that defendant put a ring on his finger before he attacked the other student. Defense counsel acknowledged that "the issue about the incident with [Lisso] is . . . going to end up being talked about" but argued that this incident which was "two to three years prior that also resulted in a misdemeanor conviction . . . seems less relevant." Without expressly ruling on the admissibility of any particular evidence, the court responded that based on what was said in defendant's

opening statement and defendant's cross-examination of the prosecution's witnesses, defendant should expect that evidence regarding "his conduct . . . in the past with respect to people he [had had] issues with is going to be relevant or likely to be relevant." The judge emphasized, "I am not saying now that I definitely will, but I think there's a reasonable likelihood that will come in."

Thereafter, during the course of his testimony, defendant acknowledged that he had been involved in a number of fights at school and had been expelled from at least one school for fighting. He also acknowledged that he was prosecuted in the juvenile justice system for the fight that occurred in the eighth grade. On cross-examination, the prosecutor asked if defendant was aware that his school records showed 50 to 60 prior disciplinary incidents and defendant stated that the number sounded accurate. The prosecutor also clarified that defendant had actually participated in three fights that resulted in expulsion from three different schools, and questioned defendant regarding the details of these fights. The prosecutor also questioned defendant regarding two fights that occurred when he was in eighth grade, including the one that resulted in the juvenile adjudication.

Defendant contends that admission of evidence concerning his prior school fights, which had no connection to either the killing or to his conflict with the Crescent Park gang, was irrelevant and inadmissible propensity evidence. Defendant concedes he did not object to any of this evidence. He argues that an objection would have been futile in light of the court's ruling and alternatively that his attorney was ineffective in failing to object. In light of the court's clear admonition that it was not ruling on the admissibility of any evidence beyond that which gave rise to the juvenile court adjudications, we cannot agree that further objection would have been futile. Accordingly, we must consider defendant's argument within the context of his ineffective assistance of counsel claim.

The requirements for establishing that trial counsel's performance was constitutionally deficient are well-known. First, counsel's conduct must fall outside the wide range of reasonable professional assistance. Second, the defendant must establish

12

prejudice resulting from counsel's errors or omissions, by showing that there is a reasonable probability of a more favorable outcome but for the deficiencies. A probability is reasonable when it is sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Vines* (2011) 51 Cal.4th 830, 875.) "[W]hen considering a claim of ineffective assistance of counsel, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' [Citation.] A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241, citing *Strickland v. Washington, supra,* at p. 697.)

As discussed above, considerable evidence of defendant's history of engaging in fights was properly admitted, either by defendant himself or as impeachment evidence. Even assuming that the additional evidence regarding other fights would have been excluded under Evidence Code section 352 if a timely objection had been asserted, there is no reasonable likelihood that defendant would have obtained a more favorable verdict absent this evidence.

5.    *Defendant has waived any error with regard to the accomplice instructions.*

The trial court instructed on the evaluation of the testimony of an accomplice with CALCRIM No. 334.[3] On appeal, defendant contends that the instructions were

---

[3] The instruction read: "Before you may consider the testimony of [Khalifa] and [Jaswinder] as evidence against the defendant, you must decide whether [Khalifa] and /or and [Jaswinder] were accomplices to the charged crime. A person is an accomplice if he is subject to prosecution for the identical crimes charged against the defendant. Someone is subject to prosecution if: [¶] (1) He or she personally committed the crime; or [¶] (2) He or she knew of the criminal purpose of the person who committed the crime; and [¶] (3) He or she intended to or did, in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime. [¶] The burden is on the defendant to prove that it is more likely than not that [Khalifa] and/or [Jaswinder] were accomplices. [¶] An accomplice does not need to be

13

incomplete because they failed to specifically state that Khalifa and Jaswinder could also be found to be accomplices if the murder was the natural and probable consequence of a planned assault. Defense counsel, however, did not object to the accomplice instruction as given, nor did counsel request that the instruction be modified to include a theory of liability based on natural and probable consequences. Accordingly, any error has been waived. Moreover, even assuming further instruction was required, any error in this regard was harmless. (*Chapman v. California, supra,* 386 U.S. 18.) The failure to give accurate accomplice liability instructions is harmless if there is sufficient evidence in the record to corroborate the accomplice testimony. (*People v. Hinton* (2006) 37 Cal.4th 839, 880; *People v. Avila* (2006) 38 Cal.4th 491, 562.) The corroborating evidence may be circumstantial and need not be sufficient to establish every element of the charged offense. (*People v. Hinton*, *supra*, at p. 880.)

---

present when the crime is committed. On the other hand, a person is not an accomplice just because he is present at the scene of the crime even if he knows the crime will be committed or is being committed and does nothing to stop it. [¶] A person may be an accomplice even if he is not actually prosecuted for the crime. [¶] If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his testimony as you would that of any other witness. [¶] If you decide that a witness was an accomplice, then you may not convict the defendant of murder based on his statements and/or testimony alone. [¶] You may use the testimony of an accomplice to convict the defendant only if: [¶] (1) The accomplice's testimony is supported by other evidence that you believe; [¶] (2) That supporting evidence is independent of the accomplice's testimony; and [¶] (3) That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the charged crimes. And it does not need to support every fact about which the accomplice testified. On the other hand, it is not enough that the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the testimony of one accomplice cannot be provided by the testimony of another accomplice. [¶] Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining with care and caution and in light of all the other evidence."

In this case, the stories told by Khalifa and Jaswinder are largely similar to that told by defendant. The only critical difference identified by defendant is whether defendant removed the gun before approaching the victim. Both Khalifa and Jaswinder testified that he removed the gun, at least partially, as he exited the car. Contrary to defendant's argument, this testimony is sufficiently corroborated by the neighbor's testimony that defendant began shooting almost immediately after exiting the car and before he reached the victim.

6. *Defendant's challenge to his sentence under the Eighth Amendment is moot.*

Defendant was sentenced to a term of 50 years to life, 25 years to life on the murder count, and a consecutive 25-year-to-life term for the use of the firearm that caused death. (§§ 190, subd. (a), 12022.53, subd. (d).) Defendant contends his sentence is a de facto life without the possibility of parole (LWOP) sentence which violates the proscriptions against cruel and unusual punishment in the United States and California Constitutions. The Attorney General disputes this contention and argues further that even if the sentence as imposed is so regarded, any need for resentencing has been eliminated by the recent enactment of Senate Bill No. 260 which cured any constitutional infirmity. [4]

In *Graham v. Florida* (2010) 560 U.S. 48, 75 (*Graham*), the court held that the Eighth Amendment prohibits states from sentencing a juvenile convicted of a nonhomicide offense to life imprisonment without the possibility of parole. In *Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2464], the court further expanded the scope of the protection afforded juveniles, holding that even in homicide cases a *mandatory* sentence of life in prison without the possibility of parole imposed on a defendant who was under the age of 18 at the time of his or her crime violates the Eighth Amendment. The court explained that the Eighth Amendment does not necessarily foreclose a sentence of life without the possibility of parole on " 'the rare juvenile offender whose crime

---

[4] Defendant contends only that his sentence is categorically cruel and unusual under *Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2464] and *People v. Caballero* (2012) 55 Cal.4th 262, discussed *post,* and disavows any claim based on asserted disproportionality of the sentence.

reflects irreparable corruption' " (567 U.S. at p. ___ [132 S.Ct. at p. 2469]), but does require that prior to imposing such a sentence, the court "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*ibid.*, fn. omitted). The court explained, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id.* at p. 2468.)

In *People v. Caballero*, *supra*, 55 Cal.4th at page 268 the California Supreme Court held that in nonhomicide cases involving juvenile offenders, the Eighth Amendment categorically prohibits the imposition of a sentence that is the "functional equivalent" of a LWOP sentence because the defendant's parole eligibility date would fall outside his natural life expectancy. Although the court in *Caballero* declined to reach the question of whether mandatory, de facto life sentences for juveniles in homicide cases would violate the Eighth Amendment (55 Cal.4th at p. 268, fn. 4, citing *Miller, supra,* 567 U.S. ___ [132 S.Ct. 2455]), subsequent appellate decisions have held that an expansive interpretation of what constitutes a life sentence should also apply in such cases (see *People v. Thomas* (2012) 211 Cal.App.4th 987, 1014-1016; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482).

It is undisputed that defendant committed the crime when he was 16 years old and, taking into account his presentence custody credits, under the sentence imposed he would first become eligible for parole in 2060 or 2061, at the age of 66 years. To support his argument that the sentence was equivalent to an LWOP, defendant cites data from the

Centers for Disease Control and Prevention showing that an African-American male born in 1994 has a life expectancy of between 65 and 73 years and can expect to live to either 2059 or 2067, depending on whether one looks at life expectancy at his year of birth (1994) or in 2008.[5] In *People v. Perez* (2013) 214 Cal.App.4th 49, 57-58, the court recognized that there is no bright line defining "[h]ow much life expectancy must remain at the time of eligibility for parole" to satisfy constitutional concerns, but concluded that there must be at least "time left for [a defendant] to demonstrate, as the *Graham* court put it, 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " In light of our conclusion *post*, that recently enacted legislation has cured any constitutional defect in defendant's sentence, we need not decide whether the sentence imposed on defendant, in view of his life expectancy, is the functional equivalent of an LWOP sentence. We shall assume, without deciding, that the sentence, when imposed, violated the Eighth Amendment and that had there been no intervening developments, remand for resentencing would have been required.

The Attorney General argues, however, that the recent enactment of Senate Bill No. 260, adding section 3051 to the Penal Code, negates the need to remand this matter for resentencing. Section 1 of Senate Bill No. 260 states in relevant part: "The Legislature finds and declares that, as stated by the United States Supreme Court in *Miller*[*, supra,* 567 U.S. ___] [132 S.Ct. 2455], 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and

---

[5] See The Centers for Disease Control and Prevention, National Vital Statistics Reports (2008) volume 61, number 3, U.S. Life Tables, <http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf> [as of 2/28/14].) Defendant's request for judicial notice of the Centers for Disease Control and Prevention documents is granted.

neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*] and [*Miller*]." (Legis. Counsel's Dig., SB 260 (2013–2014 Reg. Sess.) § 1, pp. 2–3.)

Newly enacted Penal Code section 3051 provides that "any prisoner who was under 18 years of age at the time of his or her controlling offense" shall be afforded a "youth offender parole hearing" before the Board of Parole Hearings (the board). (Pen. Code, § 3051, subd. (a)(1).) The hearing "shall provide for a meaningful opportunity to obtain release. The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release." (Pen. Code, § 3051, subd. (e).) Any psychological evaluations and risk assessments used by the board "shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Pen. Code, § 3051, subd. (f)(1).) With limited inapplicable exceptions, juvenile offenders sentenced to a "term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing . . ." (Pen. Code, § 3051, subds. (b)(3), (h).)[6]

---

[6] We interpret subdivision (b)(3) of Penal Code section 3051 as setting the eligibility date for juvenile offenders sentenced to a term of 25 years to life or greater. Thus, defendant, who was sentenced to a term of 50 years to life, will be eligible for a youth offender parole hearing during his 25th year of incarceration. The Attorney General's argument implicitly agrees with this interpretation.

18

California Courts of Appeal are divided on the effect of this new legislation on sentencing challenges under the Eighth Amendment. (See *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014 (S214652); *People v. Martin* (2013) 222 Cal.App.4th 98; *In re Heard* (2014) 223 Cal.App.4th 115.) In *People v. Martin*, *supra*, at pages 104 to 105, the court concluded that in light of the new statutory provision, defendant's sentence of 45 years plus two consecutive life terms was not unconstitutional under the Eighth Amendment. The court explained, "Newly created section 3051 . . . provides Martin 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' [Citation.] Martin was 19 years old at his June 29, 2012, sentencing, and pursuant to section 3051, will receive a youth offender parole hearing at age 44. His present sentence therefore is not 'the functional equivalent of a life without parole sentence.' " (222 Cal.App.4th at p. 105.) The court rejected defendant's argument that he was "entitled to a new sentencing hearing during which the trial court considers 'all mitigating circumstances attendant in [his] crime and life.' " (*Ibid.* at p. 105, quoting *People v. Caballero, supra*, 55 Cal.4th at pp. 268-269.) Relying in part on *In re Alatriste* (which the Supreme Court has agreed to review), the *Martin* court explained: "The judicial decisions discussed here 'merely hold that a juvenile defendant may not be incarcerated for life or its functional equivalent without some meaningful opportunity for release on parole during his or her lifetime.' [Citation.] Indeed, *Caballero* states that the court shall consider the mitigating circumstances 'so that it can impose a time when the juvenile offender will be able to seek parole from the parole board.' [Citation.] Senate Bill No. 260 (2013-2014 Reg. Sess.) insures that Martin will be afforded a meaningful opportunity for release on parole after a set number of years based upon fixed criteria." (222 Cal.App.4th at p. 105.)

In *In re Heard*, *supra*, 223 Cal.App.4th 115 (*Heard*), the court disagreed with *Alatriste* and *Martin*. The *Heard* court explained, "Although Senate Bill No. 260 offers almost all juvenile offenders a 'meaningful opportunity' to obtain parole during their lifetimes, we do not share the court's determination in *Alatriste* that Senate Bill No. 260 essentially allows a sentencing court to ignore the requirements of *Graham*, *Miller*, and

19

*Caballero*. These three cases focus on the differences between adult offenders and juvenile offenders. (See *Graham, supra*, 560 U.S. at pp. 67-69; *Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469]; *Caballero, supra*, 55 Cal.4th at p. 267.) They stress the importance of the sentencing court considering these differences when sentencing the juvenile offender. The holding of *Alatriste, supra*, 220 Cal.App.4th 1232, allows the sentencing court to disregard *Graham*, *Miller*, and *Caballero* because of the impact of Senate Bill No. 260 on a juvenile's sentence. In other words, *Alatriste* relieves the sentencing court of its constitutional duty to consider the differences between juveniles and adults when sentencing juvenile offenders because Senate Bill No. 260 is intended to provide a juvenile offender a "meaningful opportunity" to obtain release on parole during his or her lifetime. [¶] We do not read Senate Bill No. 260 as a replacement of the sentencing court's execution of its constitutional duties as required under [*Graham*, *Miller,* and *Caballero*], to consider the differences between juveniles and adults when sentencing a juvenile offender. Instead, we view Senate Bill No. 260 as a 'safety net' to guarantee a juvenile offender the opportunity for a parole hearing during his or her lifetime. As a result, we conclude the sentencing court still must attempt to prescribe the constitutionally appropriate sentence under *Graham*, *Miller*, and *Caballero*. [¶] . . . [¶] This is all the more true because there is no guarantee that Senate Bill No. 260 will remain in existence when Heard would be eligible to benefit from it. We are troubled by the potential consequences if California trial courts begin to ignore the requirements of [*Graham, Miller,* and *Caballero*], in sentencing juvenile offenders only to have Senate Bill No. 260 replaced or repealed at a later date. The prudent course remains for a sentencing court to abide by the constitutional requirements of those cases in sentencing juvenile offenders." (*Heard, supra*, 223 Cal.App.4th at pp. 130-131, fns. omitted.)

We find the reasoning set out in *Martin* more compelling. Unlike the court in *Heard, supra,* 223 Cal.App.4th 115, we do not read *Miller, supra*, 567 U.S. ___ [132 S.Ct. 2455], to require the trial judge at the time of initial sentencing to make a determination as to when a particular juvenile offender should become eligible for parole consideration. Rather, the high court and subsequently our state Supreme Court have

condemned imposition of a sentence on most juveniles that denies them a meaningful opportunity for parole during their lifetime. While an effective LWOP sentence imposed prior to the enactment of Penal Code section 3051 may have violated constitutional restrictions when rendered, the new section has provided the parole opportunity that was constitutionally lacking. Without the recent legislation, defendant here arguably faced "the functional equivalent of a life without parole sentence" as described in *Caballero, supra*, 55 Cal.4th at page 268, triggering the need for the exercise of discretion under *Miller*. However, with the new parole eligibility date provided by Penal Code section 3051, defendant's sentence is no longer the functional equivalent of an LWOP sentence and no further exercise of discretion at this time is necessary.

We believe that the procedure adopted in Penal Code section 3051 is preferable to the determination of parole eligibility dates for juvenile offenders when they are sentenced. The underlying rationale for constitutionally requiring that juvenile offenders be afforded an opportunity for meaningful parole is that many will outgrow the youthful characteristics responsible for their criminal conduct and with maturity become capable of leading constructive and law-abiding lives. (*Miller*, *supra*, 567 U.S. at pp. ___ [132 S.Ct. at pp. 2464-2465].) Whether a particular juvenile acquires the maturity and insight to justify parole certainly can be determined more intelligently and more fairly with the passage of time, rather than by a prediction at the time of sentencing. The statute provides predictability for most juvenile offenders and relieves trial judges of the great uncertainty inherent in setting an alternative parole eligibility date. (See *Caballero, supra*, 55 Cal.4th at pp. 268-269 [declining to provide trial courts with a precise time frame for setting future parole hearings but requiring sentencing courts to "consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board"].)

Penal Code section 3051 is precisely what the court in *Caballero, supra*, 55 Cal.4th at page 269, footnote 5 urged the Legislature to adopt: "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." The Legislature has gone further and created a mechanism applicable to most juvenile offenders, including those guilty of homicide crimes. With that mechanism now embedded in the statutory scheme, there is no basis for remanding the matter to the trial court to fix a parole eligibility date which, if not the date prescribed by the new statute, would necessarily be a date plucked from the air without statutory authority or precise criteria.

Similarly, we also disagree with the court in *Heard* that the remote possibility that Penal Code section 3051 might be replaced or repealed requires that we disregard its current applicability. Should this unlikely event occur, it will be time enough to consider appropriate relief, whether by petition for habeas corpus or other appropriate means.

In short, because defendant no longer faces the functional equivalent of life without the possibility of parole for the crime he committed as a juvenile, he is not entitled to a new sentencing hearing under *Miller* or remand under *Caballero* to determine the time for parole eligibility.

7.  *Custody Credits*

Defendant contends and the Attorney General concedes that the trial court improperly denied him 502 presentence custody credits under section 2933.2. We agree that defendant was entitled to these credits under section 2900.5 and, accordingly, order the judgment modified to reflect the additional 502 credits.

DISPOSITION

Defendant's judgment of conviction is affirmed. The judgment is modified to award defendant 502 custody credits under Penal Code section 2900.5.

                                                 _____

                                                 Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Jenkins, J.

A135607

Superior Court of Contra Costa County, No. 51103019, Leslie G. Landau, Judge.


Counsel for Plaintiff and Respondent:        Gene D. Vorobyov


Counsel for Defendant and Appellant:        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General,  Juliet B. Haley, Deputy Attorney General.


A135607